IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| BARRON K. PINKNEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:11-CV-244-WKW |
| | ) | [WO] |
| MOBIS ALABAMA, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the court are Defendant's Motion for Summary Judgment (Doc. # 28), the brief filed in support of and in opposition to the motion, and the supporting and opposing evidentiary materials (Docs. # 29, 30, 42). After careful consideration of the arguments of counsel, the appropriate law, and the evidence, the court finds that Defendant's motion is due to be granted.

## I.  JURISDICTION AND VENUE

The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1343 (civil rights), 42 U.S.C. §§ 2000e *et seq.* (Title VII of the Civil Rights Act of 1964), and 38 U.S.C. § 4212 (Vietnam Era Veterans' Readjustment Assistance Act of 1974). The parties do not contest personal jurisdiction or venue.

## II. BACKGROUND

The facts are viewed in the light most favorable to the nonmovant, Plaintiff, who proceeds *pro se*.  On April 4, 2011, Plaintiff Barron K. Pinkney ("Pinkney" or "Plaintiff") filed the instant action under the Vietnam Era Veterans' Readjustment Assistance Act of 1974 ("VEVRAA") and Title VII of the Civil Rights Act of 1964 ("Title VII") challenging the termination of his employment with MOBIS Alabama, LLC ("MOBIS").  (Doc. # 1.)  Pinkney is a black male, who served in the United States Air Force in Germany and the United States during the Vietnam War era.[1] (Doc. # 30 at 5.)  In October 2007, Aerotek, a staffing agency, assigned Pinkney to work for MOBIS Alabama Instrument Panel, LLC ("MAIP"), which is an affiliate of MOBIS located on its campus.  (Doc. # 30 at 6.)  In January 2008, Pinkney applied for a permanent position with MOBIS,[2] and on his application, he indicated that he was willing to work on the first, second, or third shift.  *Id.*  On February 6, 2008, MOBIS offered permanent employment to Pinkney as a Maintenance Technician on the second shift (6:30 p.m. to 6:00 a.m).  *Id.*  Pinkney's supervisors included Gary

---

[1] Plaintiff does not give a full factual background of the events that transpired in this case in his complaint or response, so the court is left with MOBIS's brief and Plaintiff's deposition to put together the facts.  In its brief, MOBIS states that its factual section outlines the evidence in the light most favorable to Plaintiff as required by law.  (Doc. # 30 at 4–5.)

[2] In June 2009, MAIP and MOBIS merged, and MOBIS took on all of MAIP's employees.  (Doc. # 30 at 6.)  Both parties refer to MAIP as MOBIS throughout; therefore, for consistency, the court will as well.

Howard ("Howard"), who is white, Wade Whetstone ("Whetstone"), who is black, and Johnny Pringle ("Pringle"), who is black. *Id.*

In June 2008, Pinkney complained about racial discrimination in the workplace. (Doc. # 30 at 7.)  Pinkney alleged that Team Leader Mike Tesino ("Tesino") and Process Technician Gary Procee ("Procee") unfairly criticized his work and tried to convince MOBIS to terminate Pinkney's employment. *Id.*  Pinkney contended that black employees, particularly Whetstone, referred to each other as "n----r," that Tesino referred to Whetstone as "Buck Wheat," that white employees received preferential task assignments (technical instead of cleaning), and that MOBIS gave new tools and access to manuals to white employees, but did not give black employees the same tools or access.  (Doc. # 29-2 at 30.)  Pinkney did not allege that any white employee used the word "n----r," nor did he allege that any employee ever directed the denigrating word toward him.  (Doc. # 29-2 at 27, 32, 34.)  MOBIS conducted an investigation of the complaints but was unable to substantiate any of the claims.  (Doc. # 29-1 at 82-108; Doc. # 30 at 7.)  After MOBIS investigated his complaints, Pinkney did not hear the aforementioned individuals use the racially charged language again. (Doc. # 29-2 at 33.)

On or about July 31, 2009, Pinkney sought medical treatment for a shoulder injury.  (Doc. # 30 at 8.)  Pinkney's doctor instructed him to take a couple of days off

work, and Pinkney put in a request with Howard to take vacation time on August 3-4, 2009. *Id.* Howard approved Pinkney's request. *Id.* On August 5-6, 2009, Pinkney also was absent from work; however, he did not request permission to take those days off. He felt it was unnecessary due to the prior-approved request for vacation time based on the same injury. *Id.*; (Doc. # 29-1 at 73.) In the very early morning of August 19, 2009, Pringle, the Second Shift Production Manager, gave Pinkney a Team Member Attendance Notification ("Notification") related to his absences on August 5 and August 6. *Id.* MOBIS has a "No Fault Attendance Policy." (Doc. # 30 at 7; Doc. # 29-1 at 29–32.) To ensure that each employee receives notice of his attendance record, MOBIS requires its employees to sign a Team Member Attendance Notification. *Id.* Signing the Notification is solely an acknowledgment of receipt, and it provides space to provide a written dispute of the contents. Human Resources ("HR") will subsequently investigate the dispute and make any necessary corrections as warranted. *Id.* Refusal to sign the Notification results in immediate termination.[3] (Doc. # 30 at 9; Doc. # 29-1 at 29–32.)

---

[3] The Notification states: "All notifications must be signed by the employee. Failure to sign the notification will result in immediate termination. Signing is not an admission of guilt, simply a verification of receipt. Employees are encouraged to write their version of the incident. The absence of any statement on the part of the employee indicates his/her agreement with the notification as stated." (Doc. # 30 at 9.)

Pringle asked the Team Relations Specialist, Lamar Miller ("Miller"),[4] to sit in on the meeting with Pinkney; both Pringle and Miller are black.  (Doc. # 30 at 8.) Pringle read the Notification to Pinkney, and instructed Pinkney to sign the Notification to verify receipt.  *Id.*  Pinkney did not agree with its issuance and refused to sign the Notification.  *Id.*  Pringle emphasized that signing is not an admission of guilt, but rather a verification that Pinkney received the Notification, and that he could provide a statement contesting its contents, which HR would review in the morning. (Doc. # 29-1 at 73.)  Pinkney again asserted that it had been issued in error and refused to sign.  (Doc. # 30 at 8.)  Pringle sent Pinkney back to work and called the Assistant Manager of Team Relations, Curt Bennett ("Bennett"), at his home.  (Doc. # 30 at 9.)

Bennett instructed Pringle to call Pinkney back into his office and give him another opportunity to sign the Notification.  *Id.*  Pinkney again expressed that he did not believe he should be issued the Notification, and refused to sign.  *Id.*  As instructed by Bennett, Miller told Pinkney to turn over his access badge to Kevin McCaskill ("McCaskill"), and both Miller and McCaskill escorted Pinkney out of the building.  (Doc. # 30 at 10.)  In the afternoon of August 19, 2009, Bennett called

---

[4] Pinkney consistently refers to Lamar Williams; however, it was established that Pinkney was mistaken and Lamar Williams's real name is Lamar Miller.  (Doc. # 29-3 at 31–32.)

Pinkney at his home and informed him that the Personnel Department had terminated his employment. *Id.*

On December 7, 2009, Pinkney filed a Charge of Discrimination ("EEOC Charge") with the Equal Employment Opportunity Commission ("EEOC").  (Doc. # 29-7 at 2; Doc. # 30 at 10.)   Pinkney alleged that MOBIS administered its attendance policy in a racially discriminatory manner.  *Id.*  Pinkney complained of other employees' use of "Buck Wheat" and "n----r," which were the subject of his June 2008 internal complaint, as well as Tesino's statement that "America is not ready for a Black President."  *Id.*  Pinkney also stated that overtime opportunities and the assigning of cleaning duties as opposed to technical duties were given in a racially discriminatory manner.  *Id.*  Finally, Pinkney alleged that Howard would "reluctantly allow Black employees to defend themselves against any accusations."  (Doc. # 29-7 at 2; Doc. # 30 at 10–11.)

On January 5, 2011, the EEOC issued the following determination:

Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by the charge.

(Doc. # 1-1.)  The EEOC notified Pinkney that he had ninety days from the receipt of the notice to file a lawsuit, if he chose to do so.  *Id.*  On April 4, 2011, Pinkney filed

6

his complaint, alleging that MOBIS violated the VEVRAA and Title VII.  (Doc. # 1

at 1.)  Pinkney alleges that the  discrimination was as follows:

> (1) Attendance policies as described in employee handbook were not applied to fellow Caucasian maintenance and process technicians. (2) Shift preference was given to Caucasian team member Charles Royal who had less seniority. (3) Tools, training and computer access was provided to Caucasian maintenance and process technicians only. (4) Process technician jobs were filled with Caucasians without giving Black technicians an opportunity. (5) Miscounseling, lack of representation and termination.  (6) False reporting by IP Manager Gary Howard.

(Doc. # 1 at 2.)  Pinkney requests recovery of back pay and reinstatement to his

former position with MOBIS, as well as any other appropriate relief.  (Doc. # 1 at 3.)

### III.  SUMMARY JUDGMENT STANDARD

All litigants, *pro se* or not, must comply with the Federal Rules of Civil

Procedure.  Although the court is required to liberally construe a *pro se* litigant's

pleadings, the court does not have "license to serve as *de facto* counsel for a party . . .

or to rewrite an otherwise deficient pleading in order to sustain an action." *GJR Invs.,*

*Inc. v. Cnty. of Escambia, Fla.*, 132 F.3d 1359, 1369 (11th Cir. 1998) (citations

omitted), *overruled on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir.

2010); *see also Giles v. Wal-Mart Distrib. Ctr.*, 359 F. App'x 91, 93 (11th Cir. 2009)

(internal citations and quotations omitted) ("Although *pro se* pleadings are held to a

less strict standard than pleadings filed by lawyers and thus are construed liberally,

this liberal construction does not give a court license to serve as de facto counsel for a party, or to rewrite an otherwise deficient pleading in order to sustain an action.").

A party in a lawsuit may move a court to enter summary judgment before trial. Fed. R. Civ. P. 56(a)–( b).  Summary judgment is appropriate when the moving party establishes that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a);[5] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1231–32 (11th Cir. 2011).  "[T]he substantive law will identify which facts are material."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Ritchey v. S. Nuclear Operating Co.*, 423 F. App'x 955, 958 (11th Cir. 2011) (quoting *Anderson*).  At the summary judgment juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.  Only disputes about the material facts will preclude the granting of summary judgment.  *Id.*

---

[5] Effective December 1, 2010, Rule 56 was "revised to improve the procedures for presenting and deciding summary-judgment motions."  Fed. R. Civ. P. 56 advisory committee's note.  Under this revision, "[s]ubdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word-genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination."  *Id.*  "'Shall' is also restored to express the direction to grant summary judgment."  *Id.*  The Advisory Committee was careful to note that the changes "will not affect the continuing development of the decisional law construing and applying these phrases."  *Id.*  Thus, although Rule 56 underwent stylistic changes, its substance remains the same, and, therefore, all cases citing the prior versions of the rule remain equally applicable to the current rule.  *Id.*

The movant bears the initial burden of proof.  *Celotex*, 477 U.S. at 323.  A party must support its assertion that there is no genuine issue of material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  The admissibility of evidence is subject to the same standards and rules that govern admissibility of evidence at trial.  *Clemons v. Dougherty Cnty., Ga.*, 684 F.2d 1365, 1369 n.5 (11th Cir. 1982) (citing *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 556 (5th Cir. 1980)).

Once the movant meets its burden under Rule 56, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586– 87 (1986).  A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Moore*, 637 F.3d at 1232 (quoting *Anderson*, 477 U.S. at 248).  The court must view the facts and draw all reasonable inference in favor of the nonmoving party.  *Id*. (citing *Rosario v. Am. Corrective Counseling Servs., Inc.*, 506 F.3d 1039, 1043 (11th Cir. 2007)); *Greenberg*

*v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) ("We view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion." (citation and internal quotation marks omitted)).  However, to avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586 (citations omitted).   Conclusory assertions, unsupported by specific facts, presented in affidavits opposing the motion for summary judgment are likewise insufficient to defeat a proper motion for summary judgment.  *Lejaun v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).  "Speculation does not create a *genuine* issue of fact."  *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (citation omitted) (emphasis in original).  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.  *See Anderson*, 477 U.S. at 249–50 (citations omitted).  In short, summary judgment is proper after adequate time for discovery and upon motion against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case. *Celotex*, 477 U.S. at 322.

## IV. DISCUSSION

### A.   <u>VEVRAA</u>

In his complaint, Pinkney alleges that MOBIS violated VEVRAA, but provides no allegations regarding how MOBIS is in violation.  Even without a factual assertion, Pinkney's claim fails at the outset.  VEVRAA states in relevant part:

> Any contract in the amount of $100,000 or more entered into by any department or agency of the United States for the procurement of personal property and nonpersonal services (including construction) for the United States, shall contain a provision requiring that the party contracting with the United States take affirmative action to employ and advance in employment qualified covered veterans.

38 U.S.C. § 4212(a) (2012).  To be subject to the regulations set forth under VEVRAA, MOBIS would have to have at least one federal contract in excess of $100,000.

MOBIS asserts that it does not have any contracts with the federal government. (Doc. # 30 at 14–15.)  The only evidence Pinkney submits to demonstrate that MOBIS has a contract with the United States is that MOBIS provides parts to Hyundai, which in turn sells its completed vehicles to private rental car agencies that rent the Hyundai vehicles to federal employees.  (Doc. # 29-3 at 26–28.)  Pinkney's logic is flawed. The attenuated chain of events, beginning with MOBIS's providing parts to Hyundai to make cars and ending with a federal employee's rental of a Hyundai vehicle from a private rental car agency, does not make a contract or subject MOBIS subject to the

11

VEVRAA.  Additionally, even if Hyundai's contracts could be used to bridge the gap between MOBIS and the VEVRAA, it is undisputed that

> HMMA [Hyundai Motor Manufacturing Alabama, LLC] does not and has not previously entered into any contracts for the procurement of personal property and nonpersonal services for $100,000 or more with: the United States Postal Service, the District of Columbia, or the United States of America or any of its departments or agencies (including construction) for the United States.

(Doc. # 29-9 at 2–3 (Affidavit of Richard E. Neal, Vice President Administration & General Counsel for HMMA).)  MOBIS is not a covered entity under VEVRAA; therefore, Pinkney's VEVRAA claim against MOBIS fails, and the summary judgment motion is due to be granted as to this claim.

## B.   Title VII - Disparate Treatment

Pinkney alleges that MOBIS violated Title VII by participating in racially discriminatory behavior that ultimately led to Pinkney's termination.  Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  "A plaintiff may prove a claim of intentional discrimination through direct evidence, circumstantial evidence, or through statistical proof."  *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008) (citations omitted); *see also Dixon v. The Hallmark Cos.*, 627

F.3d 849, 854 (11th Cir. 2010) (Direct evidence of discrimination is "evidence that, if believed, proves the existence of a fact without inference or presumption." (quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004))).  Pinkney presents no statistical or direct evidence of discrimination.  Pinkney must prove his discrimination claim, therefore, by relying on circumstantial evidence.

Courts evaluate the sufficiency of circumstantial claims using the analytical framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973).  A plaintiff must show an inference of discriminatory intent, so he carries the initial burden of establishing a *prima facie* case of discrimination.  *Rioux*, 520 F.3d at 1275; *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010).  "Presenting a prima facie case is not onerous as it requires only that the plaintiff establish facts adequate to permit an inference of discrimination."  *Rioux*, 520 F.3d at 1275 (citing *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)).

Next, should the plaintiff establish a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment action.  *Brown*, 597 F.3d at 1174.  The defendant "need not persuade the court that it was actually motivated by the proffered reason[ ]." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981); *accord Alvarez*, 610 F.3d at 1265.  Rather, it is merely a burden of production.  If the defendant presents a legitimate,

13

nondiscriminatory reason, the burden shifts back to the plaintiff to produce evidence that the defendant's proffered reason is a pretext for discrimination. *Alvarez*, 610 F.3d at 1264. "The focused inquiry in the last step requires the plaintiff to demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason[ ] for its action that a reasonable factfinder could find them unworthy of credence." *Rioux*, 520 F.3d at 1275 (citation and internal quotations omitted). In other words, at the summary judgment stage, the plaintiff may survive by providing a *prima facie* case and evidence sufficient for a jury to find that the employer's proffered explanation is false. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147–48 (2000). Moreover, despite the shifts in the burden of production, the ultimate burden of persuasion remains on the plaintiff to show that the defendant intentionally discriminated against him. *Alvarez*, 610 F.3d at 1264 (citations omitted).

Pinkney alleges that he was terminated from his employment because of his race.[6] Under the *McDonnell Douglas* framework, a plaintiff may establish a *prima facie* case by showing that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he

---

[6] Pinkney has admitted on several occasions, including in his EEOC Charge, that he was terminated for refusing to sign the Attendance Notification. (Doc. # 29-10 at 3.) His contention revolves around MOBIS's allegedly disparate treatment of black employees that led him to refuse to sign the document.

was replaced by a person outside of his protected class or was treated less favorably than a similarly situated individual outside of his protected class. *Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003). Pinkney is a member of a protected class; he was qualified for his position; and his August 19, 2009 termination constitutes an adverse employment action.[7] (Doc. # 30 at 23 ("For purposes of this motion, MOBIS does not dispute that Pinkney can offer evidence in support of the first three elements of the *prima facie* case with his claim arising out of the termination of his employment.").) Therefore, only the fourth prong is in dispute. Pinkney must show that MOBIS replaced him with an individual outside of his protected class or treated him less favorably than a similarly situated individual outside of his protected class. *Maynard*, 342 F.3d at 1289.

### 1.   *Pinkney's Replacement*

Initially, the court examines whether there is evidence that MOBIS replaced Pinkney with a person outside of his protected class. MOBIS submits evidence that it did not immediately fill the vacancy left after Pinkney's termination. (Doc. # 29-1 at 11.) In March 2010, seven months after Pinkney's termination, MOBIS hired Eric Brown ("Brown") to fill Pinkney's vacant position. Brown is black. *Id.* Since Brown

---

[7] One of Pinkney's allegations involves a 2008 negative evaluation at the end of his probationary period, where Howard recommended that Pinkney not be retained as an employee. However, MOBIS hired Pinkney as a permanent employee despite the evaluation; therefore, Pinkney did not suffer any adverse employment action, and this claim fails under the third prong.

is the same race as Pinkney, and Pinkney submits no evidence that he was replaced by a person outside of his protected class, Pinkney fails to demonstrate a *prima facie* case of discrimination on this basis.

### 2.   *Treated Less Favorably*

Pinkney contends that he was treated less favorably than similarly situated individuals outside of his protected class.  He sets out five ways in which MOBIS allegedly treated him differently than his white coworkers.  The court addresses each in turn.

### a.   **Application of Attendance Policy**

Pinkney's only claim that attempts to tie racial discrimination to his termination is his claim that the "attendance policies as described in the employee handbook were not applied to fellow Caucasian Maintenance and Process Technicians," and therefore, MOBIS subjected him to disparate treatment on the basis of race when it issued him the Attendance Notification.  (Doc. # 1 at 2.)  Pinkney avers that the time sheets of three white employees, Joe Royal, Mike Tesino, and Gary Procee, ranging from February 7, 2008, to August 19, 2009, will show numerous occasions where these individuals left prior to the end of their shift, but did not receive "attendance points" or have to sign Attendance Notifications.  (Doc. # 29-11 at 3–4.)  Pinkney states that the managers and supervisors at MOBIS are the culprits of this disparate treatment

16

because they are "responsible for making sure that the attendance policies are administered fairly." (Doc. # 29-11 at 4.) Pinkney also states that Darnell Williams and Lamar Miller are "witnesses to the fact that fellow Caucasian maintenance and process technicians were not given attendance points for incidents of tardiness, absences, and leaving the job before the shift ended." *Id.* However, Pinkney submits no time sheets or witness affidavits or evidence demonstrating his personal knowledge of MOBIS's handling of these alleged infractions.

Additionally, MOBIS maintains that Pinkney's contention "is not relevant to the reasons for the only adverse employment action Pinkney can challenge as disparate treatment on the basis of his race." (Doc. # 30 at 29.) MOBIS points out that it is "undisputed that [it] did not terminate Pinkney's employment because he accrued more than the permissible number of attendance points. Rather, MOBIS terminated his employment for refusing to sign acknowledging receipt of a Team Member Attendance Notification which Pinkney believed was erroneous." *Id.* MOBIS asserts that summary judgment is appropriate on this claim because "the only proper comparators for the termination claim are other employees who engaged in the *same* conduct in which Pinkney engaged[,] namely, refusing to sign the Team Member Attendance Notification." *Id.* MOBIS is correct.

Pinkney must identify a similarly situated person outside his protected class who was not terminated for a comparable infraction.  A proper comparator would be a non-minority employee who is "similarly situated in all relevant respects." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).  The relevant inquiry is whether Pinkney and his proposed comparator were "involved in or accused of the same or similar conduct," but were "disciplined in different ways."  *Id.*

The Attendance Notification in question provides on its face that the employee's "failure to sign the notification will result in immediate termination." (Doc. # 29-5 at 2.)  Pinkney admits MOBIS terminated him after he refused to sign the Attendance Notification.  (*See, e.g.*, Doc. # 29-10 at 3 (providing in his EEOC Charge that he was "[t]erminated for not signing a report of absenteeism").)  However, Pinkney does not point to any employee outside of his protected class who refused to sign an Attendance Notification and was not fired.  He also does not identify any employee outside of his protected class who had accumulated 6 "points" for attendance violations (*see* Doc. # 29-5), but who did not receive an Attendance Notification.  Finally, it is notable that on a prior occasion in May 2008, when Pinkney received an Attendance Notification, he wrote in a correction on the Attendance Notification that subsequently was fixed after an investigation by HR. That incident demonstrates that Pinkney was aware of the procedure for an employee

18

to contest the basis for the Attendance Notification and to obtain review by HR. (Doc. # 29-1 at 59.)

In his response to MOBIS's Motion for Summary Judgment, however, Pinkney alleges that MOBIS "has not fulfilled its obligations under Rule 26 to provide plaintiff with Weekly Timesheets of all maintenance and process control technicians as requested in Plaintiff['s] First Request for Production of Documents." (Doc. # 42 at 1.)  Pinkney states that these documents "would clearly show that the Attendance Policies were not followed when applied to fellow Caucasian maintenance and process control technicians." *Id.*  However, there is no indication in the record that Pinkney ever tried to compel production of the time sheets requested.

To survive a motion for summary judgment, Pinkney must designate specific facts showing there is a genuine issue for trial. *Matsushita Elec. Indus.*, 475 U.S. at 586–87.  Conclusory assertions, unsupported by specific facts, presented in affidavits opposing a summary judgment motion are insufficient to defeat a proper motion for summary judgment. *Lejaun*, 497 U.S. at 888.  "Speculation does not create a *genuine* issue of fact." *Cordoba*, 419 F.3d at 1181.  Pinkney cannot show he was treated less favorably than a similarly situated individual outside of his protected class, and, thus, he fails to establish a *prima facie* case on the basis that the attendance policy was applied inequitably.

19

### b.   Cleaning Assignments

Pinkney alleges that MOBIS assigned him more cleaning-related tasks, as opposed to technical work, than it assigned to white employees.  MOBIS submits the affidavit of Bennett, who attaches incident reports from interviews with several employees, as well as the EEOC interviews.  The employees' interview statements indicate that both Pinkney and Blackwell, who is white, tended to receive more cleaning assignments than the other employees.  (Doc. # 29-1 at 101.)  However, the interviewed employees also state that both Pinkney and Blackwell, despite having many years of experience in maintenance, were the two employees most recently hired by MOBIS, and did not have the same experience with the particular machines that other employees had.  *Id.*

Pinkney was a Maintenance Technician, and tasks such as cleaning filters on the machines, among other cleaning assignments, were part of his job description. (Doc. # 29-1 at 103.)  Additionally, the statements consistently provide that all employees have to do cleaning assignments and none of the maintenance staff does purely technical work.  (Doc. # 29-1, 101 (Howard), 103 (Tesino), 105 (Whetstone), 107 (Blackwell).)  Tesino stated that he never assigned a task directly to Pinkney, but rather to every employee on a particular shift.  (Doc. # 29-1 at 104.)  MOBIS and its employees further assert that Pinkney was the only employee who believed he was

20

"above" the cleaning assignments, stated that he is not a janitor, and refused to do the tasks.[8] Despite his refusals, other employees completed the cleaning assignments, and no negative action was ever taken against Pinkney.  *Id.*

Pinkney is unable to show that he was treated differently than any similarly situated non-minority employees.  To show that non-minority employees "were similarly situated, [Pinkney] must show they were 'similarly situated in all relevant respects,' including in terms of training and experience."  *Moorer v. City of Montgomery*, 2:06-CV-672-WKW, 2008 WL 696889, at *5 (M.D. Ala. Mar. 13, 2008), *aff'd*, 293 F. App'x 684 (11th Cir. 2008) (citing *Holifield*, 115 F.3d at 1562). It is undisputed that Pinkney had less seniority at MOBIS and less experience with MOBIS's machines than the majority of his coworkers.  Blackwell is the MOBIS employee most similarly situated to Pinkney in terms of seniority and shift assignment (second shift).  (Doc. # 29-1 at 14; Doc. # 29-2 at 15.)  However, Blackwell was a Process Technician and, thus, held a different position than Pinkney.  (Doc. # 29-2 at 15.)[9]  But in any event, there is no evidence that Blackwell received preferential treatment.  As Pinkney admits, Blackwell was "in the same boat" as Pinkney, and

---

[8] Notably, Pinkney's coworkers stated that Pinkney did not take any issues with his assignments while he was a temporary employee, and his complaints did not begin until he was hired as a permanent employee.  (Doc. # 29-1 at 105.)

[9] On his EEOC Charge, when asked to list the employees who received preferential treatment, Pinkney did not list Blackwell.  (Doc. # 29-10 at 4.)

other employees also reported that Blackwell was treated similarly to Pinkney, including Blackwell himself.  (Doc. # 29-1 at 101, 107; Doc. # 29-2 at 25, 54; Doc. # 29-3 at 20; Doc. # 29-10 at 4.)  In short, Pinkney fails to show that Blackwell received favorable treatment or that the other non-minority employees Pinkney identifies were similar to him in terms of seniority and in-house experience.

Under the *McDonnell Douglas* analysis, Pinkney "fail[s] to establish a *prima facie* case of disparate treatment," and summary judgment is appropriate on his claim that he was assigned more work than non-minority employees.  *Moorer*, 2008 WL 696889, at *5 (citing *Pace v. S. Ry. Sys.,* 701 F.2d 1383, 1389 (11th Cir. 1983)).

### c.     White Employee Received Shift Preference

Pinkney complains that Charles "Joe" Royal ("Royal"), a white co-worker who was hired after Pinkney, was assigned to the day shift, but Pinkney was assigned to the night shift.  (Doc. # 1 at 2.)  On January 28, 2008, Pinkney submitted an application of employment with MOBIS.  (Doc. # 29-1 at 4, 35.)  On his application, Pinkney indicated that he was willing to work the first, second, or third shift.  *Id.* Pinkney was hired on February 6, 2008, and was assigned to work the second shift. (Doc. # 29-1 at 4.)  Since he was assigned to the second shift, Pinkney received a fifty cent per hour shift differential.  *Id.* On March 9, 2008, Royal submitted an application of employment with MOBIS.  (Doc. # 29-1 at 11.)  On his application, Royal

indicated that he was only willing to work the first shift.  *Id.*  Royal was subsequently hired on April 14, 2008, and assigned to the first shift as requested.  *Id.*

Pinkney stated that he only brought the issue to light in a conversation with Royal and Nick Heo ("Heo"), the Senior Plant Manager, who Pinkney refers to as the "Korean Manager."  (Doc. # 29-2 at 16.)  Pinkney said Heo did not respond, but just listened as Pinkney asked Royal about his assignment to the first shift.  *Id.*  Pinkney admits that upon being hired, he was willing to take whatever shift was available and never demanded to be put on first shift as a condition of employment.  (Doc. # 29-2 at 17.)  Pinkney further admits that he "didn't really pursue it" later and never told anyone at MOBIS that he wanted to be on first shift, or made any request for a transfer to first shift.  (Doc. # 29-2 at 16.)  MOBIS contends that Pinkney never told MOBIS that he had a problem with Royal getting the first shift or that Pinkney believed that he should have been assigned there.  (Doc. # 30 at 30.)  MOBIS points out that Pinkney's second shift assignment does not cause him pecuniary injury, but rather resulted in Pinkney's earning more money due to the shift differential that he received.  *Id.*

Pinkney fails to make any showing that he asked for and was denied an assignment to first shift and was denied due to his race; therefore, Pinkney cannot establish a *prima facie* case.

### d.      Tools, Training, and Computer Access

Pinkney asserts that MOBIS purchased tools for white employees, while he had to provide his own.  (Doc. # 1 at 2; Doc. # 29-2 at 18.)  Pinkney further asserts that he was not given access to an office that contains training manuals, as well as a computer with technical information, until the last three months of his employment, despite the fact that white employees had access to these training opportunities.  (Doc. # 29-2 at 36.)

MOBIS contends that these statements are false.  First, MOBIS asserts that Pinkney's only evidence is that other employees told him that MOBIS purchased tools for white employees, and Pinkney admits he has no firsthand knowledge of MOBIS buying any tools for white employees.  (Doc. # 29-2 at 18-26; Doc. # 30 at 27.) MOBIS also points out that Pinkney admitted that he "didn't come straight out and ask" MOBIS to purchase a tool that he needed; therefore, he never was denied access to a tool required to do his job.[10]  (Doc. # 29-2 at 23.)  Regarding access to training literature and computers, MOBIS submits affidavits from multiple employees that support its position that the office that contains the computers and training manuals

---

[10] Pinkney originally asserted that he requested a die grinder, but when further questioned, he admitted he "didn't come straight out and ask" and the event in question involved Pinkney explaining to Howard that Procee completed a task originally assigned to Pinkney because Procee had the proper tool for the job.  (Doc. # 29-2 at 23-24.)  Howard accepted that reason and took no action against Pinkney, and the tool issue never came up again.  (Doc. # 29-2 at 24.)

remains unlocked and open to all employees.[11]   (Doc. # 29-1 at 89, 93.)   Finally, MOBIS points to Pinkney's admission that Blackwell, a white second-shift employee, "was in the same boat" as Pinkney regarding access to tools and training information. (Doc. # 29-2 at 25; Doc. # 30 at 27.)

Pinkney fails to make any showing that he asked for and was denied access to tools, training literature or computers, or that any such denial was due to his race. Moreover, there is no evidence that would be admissible at trial to support any of these claims; therefore, Pinkney cannot establish a *prima facie* case.

### e.   Process Technician Opportunities

Finally, Pinkney claims that "Process Technician jobs were filled with Caucasians without giving Black technicians an opportunity."   (Doc. # 1 at 2.) Pinkney fails to establish that he ever applied for and was denied the position of Process Technician.   When asked if the Process Technician position would have been a promotion, Pinkney stated that it would have been because process technicians likely get paid more; however, Pinkney also said that "[he] wasn't particularly interested in – personally as being a process technician."   (Doc. # 29-3 at 36.)   Pinkney then confirmed that his allegations do not relate to a claim that he was denied the position

---

[11] Mike Tesino submitted an affidavit stating that "all the [training literature] is on the machines or in the office. It is available to everyone. That's why that is one of the few offices that is never locked."   (Doc. # 29-1 at 93.)   Similarly, Joe Royal submitted an affidavit stating that all of the training literature "is all either in the office or on the shelves."   (Doc. # 29-1 at 89.)

of Process Technician.  Instead, Pinkney simply asserted that while employed, two spots opened for Process Technician and that one was filled by a white man and the other by a Korean man.  (Doc. # 29-3 at 37.)  Pinkney stated that he feels that the openings "should have been posted to give all an opportunity to pursue them"; however, he presents no evidence to show how the position was solicited, nor does he assert that he or any other black person applied for and was denied the Process Technician position.  Pinkney cannot establish a *prima facie* case of disparate treatment because he fails to show that he ever applied for and was denied the position due to his race.[12]

## C.  <u>Hostile Work Environment</u>[13]

Pinkney alleges that racially hostile language used by his coworkers at MOBIS led to a hostile work environment based on race.  The Eleventh Circuit has held that

> to establish a hostile work environment claim [a plaintiff must] show: (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as national origin [or race]; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible

---

[12] Assuming that Pinkney could establish a *prima facie* case for disparate treatment, the court finds that MOBIS provides a legitimate, nondiscriminatory reason why Pinkney was terminated and that Pinkney fails to show pretext.

[13] Pinkney did not outright file a claim for hostile work environment; however, due to the allegations of racially charged language used at MOBIS, the court construes these allegations as a hostile work environment claim.

for such environment under either a theory of vicarious or of direct liability.

*Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

Applying the *Miller* factors to the totality of events in this case, the court concludes that Pinkney fails to establish a *prima facie* case of hostile work environment because the record contains no evidence that the alleged conduct "was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment." *Miller*, 277 F.3d at 1275. The Supreme Court directs courts "to determine whether an environment is sufficiently hostile or abusive by 'looking at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)); *see also Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999). The Supreme Court defines this requirement to contain both an objective and a subjective component. *Miller*, 277 F.3d at 1276. For a plaintiff to properly assert a claim, the harassing behavior must result in an environment "that a reasonable person would find hostile or abusive," as well as an environment that the victim "subjectively perceives

. . . to be abusive." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993)).

The effect of the alleged harassment in Pinkney's environment was minimal at best. While Plaintiff rightly takes offense to the use of the word "n----r" and racial slurs against other ethnicities, he fails to establish that the alleged comments were severe, pervasive, and objectively abusive. Pinkney states that fellow black employees, particularly Whetstone, referred to other black employees by calling them "n----r," Pringle (black) used the term "g--k" as a slur against Asians, Tesino (white) once said that "America is not ready for a Black president" and also called Whetstone "Buck Wheat," and Bennett once referred to Martin Luther King Day as "coon's day." (Doc. # 29-2 at 26–27, 34, 68; Doc. # 29-3 at 28–29.) Pinkney admits that no employee ever targeted any racial slur directly at him. (Doc. # 29-2 at 27–28.)

In June 2008, over a year prior to his termination, Pinkney complained about the described use of racially charged language. A full investigation was completed, including interviews with Pinkney, Royal, Tesino, and Blackwell. (Doc. # 29-1 at 82–99.) Pinkney stated that subsequent to the investigation, he did not hear Whetstone, Pringle, Bennett, or Tesino use any racially charged language again. (Doc. # 29-2 at 28–29.) However, Pinkney said he did hear other black co-workers continue to use the word "n----r" amongst themselves after the investigation. (Doc.

# 29-2 at 29.)   Pinkney never reported any subsequent use of racially charged language.  *Id.*  Accepting his allegations as true, Pinkney fails to establish that the behavior amongst coworkers that was not directed at him, and ceased after he complained over a year prior to his termination could establish the severity, pervasiveness, abusiveness, or an alteration of the terms and conditions of his employment necessary to establish a claim for hostile work environment based on race.

The court recognizes that his former coworkers' comments were understandably offensive to Pinkney; however, based upon the Eleventh Circuit's standard, those comments –  that were not directed at Pinkney and that ceased after he filed a complaint –  simply do not rise to the level required to establish a cause of action for a hostile work environment based upon race.[14]  Pinkney fails to demonstrate a genuine dispute of material fact; therefore, MOBIS's summary judgment motion on the hostile work environment claim is due to be granted.

## D.   <u>Other Claims</u>

Pinkney asserts claims in his complaint that are not properly before this court. In his complaint filed in this lawsuit on April 4, 2011, Pinkney alleges that white

---

[14] *See Hipp v. Liberty*, 252 F.3d 1208, 1233 (11th Cir. 2001) ("While the conduct Plaintiff allegedly experienced may be inappropriate in a working environment and may have been unjustified, neither Title VII nor the ADEA operate as 'general civility code[s]' that ensure a workplace free of stress or criticism, justified or not." (citing *Faragher*, 524 U.S. at 788)).

employees were given unequal opportunities to work on personal projects at the MOBIS facility; he received "miscounseling [sic], [and] lack of representation" by Miller; and there was "false reporting" by Howard.  (Doc. # 1 at 2.)  But these claims are not included in his EEOC Charge.  (Doc. # 29-10 at 2–6.)

"It is settled law that in order to obtain judicial consideration of . . . a [Title VII] claim, a plaintiff must first file an administrative charge with the EEOC within 180 days after the alleged unlawful employment practice occurred."  *Pijnenburg v. W. Ga. Health Sys., Inc.*, 255 F.3d 1304, 1305 (11th Cir. 2001) (citing 42 U.S.C. § 2000e-(5)(e)(1) (2013)); *see also Padilla v. N. Broward Hosp. Dist.*, 270 F. App'x 966, 970 (11th Cir. 2008) (citations omitted) ("Before filing a Title VII action, a plaintiff must exhaust his administrative remedies by filing a charge of discrimination with the EEOC").  Based upon this authority, Pinkney's claims that he failed to include in his EEOC charge are not properly before this court.[15]

---

[15] Additionally, Pinkney asserts claims throughout his deposition that were not included in the complaint filed in the case at bar.  During his deposition, Pinkney asserted claims for retaliation, unequal opportunities for overtime, and constant threats of termination by Howard.  (Docs. # 29-2 at 54; 29-3 at 7, 20–21, 29–32.)  "While an amendment to a complaint to add a new legal theory is permissible, the court emphasizes that Plaintiff has never sought an amendment to add this claim. A complaint may not be amended by statements in a deposition." *Sweeney v. State of Alabama Alcoholic Beverage Control Bd.*, 94 F. Supp. 2d 1241, 1270 *opinion vacated and superseded on reconsideration sub nom.* 117 F. Supp. 2d 1266 (M.D. Ala. 2000) (citing Fed. R. Civ. P. 15(a)).  Because Pinkney failed to include a "short and plain statement" as to these claims in his complaint, these claims are not properly before the court. Fed. R. Civ. P. 8(a)(2).

## V.  CONCLUSION

MOBIS has established that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law on Plaintiff's VEVRAA and Title VII claims.  Accordingly, it is ORDERED that Defendant's Motion for Summary Judgment (Doc. # 28) is GRANTED.

A separate judgment will be entered.

DONE this 30th day of September, 2013.

_____/s/ W. Keith Watkins_____
CHIEF UNITED STATES DISTRICT JUDGE

31